IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CARMEN LIDIA JORGE, et al.,

Plaintiffs,

v.

POLICE DEPARTMENT OF THE
COMMONWEALTH OF PUERTO RICO,
et al.,

Defendants.

CIVIL NO. 11-2268 (JAG/CVR)

## REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiffs Carmen Lidia Jorge, on her behalf, and on behalf of minor EFJ ("hereinafter Plaintiffs")[1], sued the Puerto Rico Police Department and a variety of Defendants for violations to minor EFJ's rights.  They aver that on December 31, 2010, Defendants intentionally engaged in excessive use of force, failure to intervene to protect the infringement of a citizen's constitutional rights, inadequate recruitment, training and supervision and interference with rights to freedom of association and expression in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of Puerto Rico.  These actions, in turn, resulted in Plaintiff EFJ being rendered a paraplegic after he was shot in Trujillo Alto and caused Plaintiffs damages.

At this stage, the remaining Defendants in the case are José Figueroa Sancha, former Puerto Rico Police Superintendent, Leovigildo Vázquez, former Deputy Superintendent for

---

[1] While the Court will refer to them collectively as Plaintiffs, when discussing particular facts of the case that only apply to Plaintiff EFJ, the Court will so specify.

Field Operations for the Puerto Rico Police, and Iván Lebrón Lebrón,  a police officer for the Puerto Rico Police ("Figueroa Sancha", "Vázquez" and "Lebrón", collectively, "Defendants").

Before the Court now is Defendants' Motion for Summary Judgment (Docket No. 162); Plaintiffs' opposition thereto (Docket No. 212); and Defendants' reply to Plaintiffs' opposition (Docket No. 222).  Defendants petition the Court to grant summary disposition of all of Plaintiffs' claims, alleging that Figueroa Sancha and Vázquez were not at the scene of the events when they transpired, and can therefore not be held responsible.  As to co-Defendant Lebrón, Defendants aver that, although he was present at the scene with another officer, "it was impossible for him to have prevented Ortíz from firing his weapon at EFJ". (Docket No. 162, p. 8).   Since there is no evidence linking Lebrón to the violations, either by direct participation or by failing to intervene, Defendants posit he cannot be liable.  They also raise the qualified immunity defense.

Plaintiffs counter arguing that summary disposition is unwarranted, as issues of fact surround the way the incident happened.  Plaintiffs argue the police shot at Plaintiff and his friend first and without provocation, and that lack of adequate training caused the officers to make serious mistakes, deviating from standard police procedure and violating Plaintiff EFJ's rights.  This, in turn, was caused by the action of inaction of Figueroa Sancha and Vázquez, which they allege can be characterized as condonation, acquiescence or gross negligence amounting to deliberate indifference, as they were aware of the pattern of violations of civilians' rights by the Police Department that had been going on for years and

did nothing to change that pattern.  These violations, in turn, were further evidenced by the findings of the United States Department of Justice study and the report of the Independent Monitor of the Puerto Rico Police.

For the reasons explained herein below, it is recommended that Defendants' Motion for Summary Judgment be DENIED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit.  Id.  Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire

record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); *see also*, Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012).   Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not-genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (*quoting* Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).  Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.  A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.  Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.  Due

Carmen Lidia Jorge, et al. v. Police Department of the Commonwealth of Puerto Rico, et al.
Civil No. 11-2268 (JAG)
Report and Recommendation
Page 5

to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  Hernández, 486 F.3d at 7.[2]

## FINDINGS OF FACT

Pursuant to the parties' submissions, the Court deems the following facts uncontested.

### THE PLAYERS

1.      In 1993, Mayra Figueroa began attending the Puerto Rico Police Academy [3]. D. Exhibit No. 2, p. 7, lines 16-19.

2.      Mayra Figueroa graduated from the Police Academy on February 14, 1994, obtaining a Police Degree.  D. Exhibit No. 2, p. 7, lines 24-25, and p. 8, lines 1-9.

3.      Mayra Figueroa started as a police officer in Trujillo Alto.  She was in charge of the vehicles for five years. D. Exhibit No. 2, p. 12, lines 4-17.

4.      After 1999, Mayra Figueroa was in the motorcycle unit in the Trujillo Alto Precinct.  She applied for the assignment because she wanted to work on the street.  D. Exhibit No. 2, p. 12, lines 21-25, p. 13, lines 1-3, and p. 15, lines 3-19.

---

[2] The Court must mention that both parties' habit of merely copying and pasting arguments that merely repeat an objection over and over, with little or no substance to the objection, and which oftentimes have no bearing on the fact itself, is a waste of the Court's time.  Likewise, the Court did not accept transcripts of deposition testimony supplied by Plaintiffs that did not pertain to this particular case.  While the parties may reach an agreement to use these types of evidence, no such agreement was evidenced to the Court in this case.

[3] Not to be confused with the "local Academy", which was what the monthly staff meetings to discuss civil rights and other matters were called.

5.    Mayra Figueroa received training in order to assume these new duties. D. Exhibit No. 2, p. 13, lines 4-6.

6.    After Mayra Figueroa's training at the Police Academy the only training received by her on civil rights and use of force were monthly staff meetings to discuss communications that are received from the general headquarters. P. Exhibit C, p.21, lines 3-16; P. 22, lines 5-16.

7.    Mayra Figueroa has never had to use her firearm.  D. Exhibit No. 2, p. 23, lines 3-4.

8.    Mayra Figueroa has never had occasion to use or exhibit force on a citizen. D. Exhibit No. 2, p. 23, lines 5-7.

9.    Mayra Figueroa has never been the subject of a complaint by a citizen. She has not been disciplined, reprimanded or suspended. D. Exhibit No. 2, p. 23, lines 8-16.

10.   In 1998, Ivan Lebrón Lebrón obtained an Associate's degree from the Puerto Rico Criminal Justice Academy.  D. Exhibit No. 3, p. 8, lines 18-25, and p. 9, line 1.

11.   After 1998, Lebrón began working as a police officer in Trujillo Alto Norte Precinct, where his duties were to protect life and property.  D. Exhibit No. 3, p. 10, lines 16-25.

12.   The training Lebrón received at the Police Academy during the two years he studied there was in the use and handling of firearms, the use of the night stick and personal defense.  D. Exhibit No. 3, p. 11, lines 1-13.

13.   Lebrón was taught how to carry out an arrest in the personal defense training provided at the Academy.  D. Exhibit No. 3, p. 11, lines 23-25, and p. 12, 1-2.

14.   Lebrón worked as an agent assigned to Trujillo Alto Norte for practically 16 years. During those years he retained the rank of Agent I.  D. Exhibit No. 3, p. 12, lines 3-10, and p. 16, lines 7-8.

15.   Lebrón has received recognition certificates during Police Officer's Week and congratulations for work performed. Also, he has received congratulations from citizens that he helped, which are in his personnel file. Exhibit No. 3, p. 19, lines 20-25, and p. 20, lines 1-7.

16.   Juan Carlos Ortíz began his studies at the Puerto Rico Police Academy in March 2003. D. Exhibit No. 4, p. 8, lines 24-25.

17.   It took approximately eleven months for Ortíz to complete the Police Academy, and in the year 2004, he began to work as a Puerto Rico Police Department Agent.  D. Exhibit No. 4, p. 12, lines 6-15.

18.   Among other subjects, the Police Academy gave Ortíz training on the use of firearms, use of force, and civil rights.  D. Exhibit No. 4, p. 12, lines 16-25, and p. 13, lines 1-3.

19.     While working in Trujillo Alto from the year 2004-2012, Ortíz received trainings through each year.  D. Exhibit No. 4, p. 20, lines 8-20.

20.     The Trujillo Alto precinct offers trainings during the year. They send the officers away to take some courses. One of the most frequent trainings is shooting practice, which every officer is required to have every year. Also, police personnel meet during the year in order to discuss events or general orders issued by the Police Department. This meeting is called a "local Academy" and it is held once a month. D. Exhibit No. 4, p. 116, line 1, and p. 117, lines 1-13; D. Exhibit No. 3, p. 18, lines 16-22.

21.     The local Academy is a meeting where all the police officers in that precinct meet and they talk and discuss several topics, general orders, and others, and other matters.  It is held once every month; therefore, there were twelve local Academy meetings held in the year 2010.  D. Exhibit No. 4, p. 117, lines 19-25.

22.     Sometimes during these monthly meetings, the issue of use of force and civil rights was brought up in situations that were seen in the news involving a fellow police officer who had done something improper.  The Academy stressed the fact that it could not happen in their precinct. D. Exhibit No. 3, p. 20, lines 19-25, and p. 21, 1-3.

23.     From the time Ortíz started working in 2004 until 2012, he was investigated administratively twice. The first time was on account of some tickets that

Carmen Lidia Jorge, et al. v. Police Department of the Commonwealth of Puerto Rico, et al.
Civil No. 11-2268 (JAG)
Report and Recommendation
Page 9

were given to a citizen, and the investigation was dismissed.  The second time was because of the facts of the Complaint.  D. Exhibit No. 4, p. 23, lines 20-25, p. 24, lines 1-25, p. 25, lines 1-15, p. 26, lines 23-25, and p. 27, lines 1-21.

24.    The only instance when Ortíz has had to use his firearm was December 31, 2010, for the incident object of this case.  D. Exhibit No. 4, p. 33, lines 13-18.

25.    Ortíz has never been subjected to disciplinary measures, suspended, or reprimanded during his career as a police agent.  D. Exhibit No. 4, p. 37, lines 1-7.

## THE FACTS

26.    On December 31, 2010, Plaintiff EFJ got into an automobile with two individuals. The vehicle was a four door, champagne colored Honda.  D. Exhibit No. 1, p. 13, lines 21-24, and p. 14, lines 1-19.

27.    Plaintiff EFJ was in the company of two other individuals.   One was nicknamed Goty and the second was nicknamed Rafo. D. Exhibit No. 1, p. 14, line 25, and p. 15, lines 1-5.

28.    "Goty" is Amaury Méndez Rosado.  D. Exhibit No. 1, p. 19, lines 19-24.

29.    "Rafo" was never caught by the authorities.  D. Exhibit No. 1, p. 19, line 25, and p. 20, lines 1-2.

30.    Rafo had a gun. He had it in his waist and it was black. Exhibit No. 1, p. 28, lines 4-13; D. Exhibit No. 1, p. 29, lines 10-11.

31.    On December 31, 2010, a recycling center in Trujillo Alto was held up. No shots were fired during the assault to the recycling center, and no one was seriously injured.  P. Exhibit B and B-1.

32.    The burglars stole $112.00 from the recycling center.  Id.

## PLAINTIFF EFJ'S ACCOUNT

33.    Plaintiff EFJ stayed in the back seat of the car while the other two people got out at the recycling center. P. Exhibit J, p. 29, lines 22-23; P.30, lines 3-4.

34.    A chase ensued, ending with the car crashing. D. Exhibit 4, p. 43, l. 20-21.

35.    When the car crashed, one of the passengers, Goty was arrested.  Plaintiff EFJ and the other passenger exited the vehicle and fled.  D. Exhibit 1a, p. 25, lines 18-25.

36.    Both green (municipal) and blue (state) police officers chased Plaintiff EFJ once he was out of the car. P. Exhibit J, p. 66, lines 14-19.

37.    At some point, Plaintiff EFJ lay down on the ground and was shot in the back. P. Exhibit J, p. 72, L. 2-8.

38.    While Plaintiff was lying down, Rafo was also laying down with his feet close to the top of Plaintiff EJ's head. P. Exhibit J, p. 70, lines 6-10.

39.    Plaintiff EFJ saw the officers that shot at him, but he cannot remember their faces.  He could not at this point in time identify them.  D. Exhibit No. 1, p. 76, lines 8-21.

40.     Plaintiff remembers two policemen because they went to Court and they were witnesses in the criminal complaint against him. They were supporting the officer who shot at him.  D. Exhibit No. 1, p. 79, lines 2-23.

## OFFICERS MAYRA FIGUEROA'S ACCOUNT

41.     On December 31, 2010, at 10:00 a.m., Mayra Figueroa started her day at the precinct. She had been assigned to work at the Loíza Municipality in a "no-more-bullets-in- the-air" caravan.  Fellow officer Luis Rivera was going with her.  D. Exhibit No. 2, p. 25, lines 2-14; D. Exhibit No. 7, p. 1.

42.     They got on their motorcycles and departed. While they were on Road 846 toward Road 199, they reached the traffic light of Roads 846 and 199.  Officer Rivera said, "[l]ook, they're holding up the recycling center."  D. Exhibit No. 2, p. 25, lines 15-18; D. Exhibit No. 7, p. 1.

43.     Mayra Figueroa looked, and noticed that there were two individuals holding up the place.  The individuals hopped in a vehicle, a champagne-colored, four-door Honda Accord.  One of the individuals was heavy-set, the other one was thin.  D. Exhibit No. 2, p. 25, lines 19-22; D. Exhibit No. 7, p. 1.

44.     Figueroa saw the two individuals get back into the car but did not see any firearms. P. Exhibit C, p. 26, lines 23-25; P. 27, lines 1-4.

45.　After getting in the car, the individuals ran the traffic light.  The officers turned the siren on and Luis Rivera said, "stay," because a gentleman came out and said, "[t]hey just held me up."  D. Exhibit No. 2, p. 25, lines 23-25; Exhibit No. 7, p. 1.

46.　Mayra Figueroa stayed at the recycling center and her co-worker went after the suspects.  D. Exhibit No. 2, p. 26, lines 1-2; D. Exhibit No. 7, p. 1.

47.　Mayra Figueroa asked the desk officer to send a patrol car to the collection center because it had just been held up, and she went on to Loíza.  D. Exhibit No. 2, p. 26, lines 5-8; D. Exhibit No. 7, p. 1.

48.　After leaving the recycling center, the next time Mayra Figueroa saw Rivera was at a bridge located at the intersection of Roads 181 and 175, waiting for her to go to Loíza.  D. Exhibit No. 2, p. 38, lines 20-24.

49.　Mayra Figueroa did not have any further participation in  the incident, but was summoned by Criminal Investigation Corps ("CIC") for the investigation, and by the prosecutor's office to provide a sworn statement.  D. Exhibit No. 2, p. 31, lines 4-16.

50.　Mayra Figueroa was not interviewed by any officer from the Special Investigations Bureau ("NIE" for its initials in Spanish) or the Department of Justice in connection with this incident.  D. Exhibit No. 2, p. 32, lines 5-9.

## OFFICER CARLOS RIVERA MAYSONET'S ACCOUNT

51. Carlos Rivera Maysonet was the first officer to approach the vehicle that was being pursued once it had stopped. P. Exhibit E, p. 41, lines 5-7.

52. When Rivera Maysonet observed the vehicle (once it had stopped) he saw one person getting out of the passenger front. P. Exhibit E, p. 40, lines 4-7.

53. While keeping an eye on the individual, who was heading to the woods, officer Rivera Maysonet had to find cover because he was hearing gunshots. P. Exhibit E, p. 40, lines 4-13.

54. Rivera Maysonet heard several shots after arresting the individual that had gotten out of the car. P. Exhibit E, p. 44, lines 10-23.

55. Rivera Maysonet did not know who was shooting, but he heard on the radio that there was an injured person. P. Exhibit E, p. 55, lines 5-7.

56. Rivera Maysonet was unarmed by the NIE or the CIC, and said arms were sent to forensic science and have not been given back to him. P. Exhibit E, p. 50, lines 15-25; P.51, line 1.

## OFFICER LUIS ALFREDO MARÍN'S ACCOUNT

57. Officer Luis Alfredo Marín participated in the persecution of the car. P. Exhibit D, p. 50, lines 7-9.

58. Several seconds passed since he last saw the car and when the car crashed. P. Exhibit D, P. 50, lines 22-25.

59. Marín stopped and observed an individual getting out on the passenger side and going into the woods. P. Exhibit D, p. 33, lines 4-9.

60. Marín had to surrender his firearm and has not received it back. P. Exhibit D, p. 48, lines 23-25.

61. Marín has not been notified if the firearm was ever examined. P. Exhibit D, p. 49, lines 1-3.

## OFFICER IVAN LEBRON'S ACCOUNT

62. Officer Ivan Lebrón first became aware of what was happening on December 31, 2010 when he was at the precinct.  He heard a call over the radio stating that officer Marrero Moya was chasing a vehicle that had supposedly committed a robbery at the recycling place near El Caney.  D. Exhibit No. 3, p. 32, lines 21-25, and p. 33, lines 1-25, and p. 34, line 1; D. Exhibit No. 7, p. 3.

63. Lebrón was at the precinct and waited for his fellow officer Ortíz to finish filling out a complaint and then left the precinct in a police unit headed towards the area where officer Marrero was.  He had not received any instructions from Sgt. Julio Galarza.  D. Exhibit No. 3, p. 38, lines 1-16; D. Exhibit No. 7, p. 3.

64. Upon arriving at Road 843 in Trujillo Alto, where the curves start on the highway, they encountered officer Rivera Maysonet, who was in custody of

the champagne-colored vehicle that had been abandoned by some individuals.  D. Exhibit No. 3, p. 39, lines 20-25; D. Exhibit No. 7, p. 3.

65. Lebrón observed the vehicle which he described as a compact vehicle, that was parked over the gutter, with two tires in the gutter and two tires on the tarmac, and both doors on the right-hand side open towards the gutter.  D. Exhibit No. 3, p. 40, lines 6-19; D. Exhibit No. 7, p. 3.

66. Although he did not inspect it, the vehicle appeared to be in good condition. D. Exhibit No. 3, p. 41, lines 13-17.

67. Lebrón observed that the area where the gutter was, and described it as a wooded area with a turn and a ravine which was not very deep.  All he could see in the area was the vehicle and officer Rivera Maysonet.  D. Exhibit No. 3, p. 40, lines 20-25 and p. 41, lines 1-7; D. Exhibit No. 7, p. 3.

68. After Lebrón saw Rivera Maysonet and the vehicle, Rivera Maysonet told him the individual had gone down the ravine into the wooded area. D. Exhibit No. 3, p. 41, lines 18-22; Exhibit No. 7, p. 3.

69. Lebrón learned there had been three individuals in the car.  Lebrón did not inquire whether Rivera Maysonet saw the individuals. D. Exhibit No. 3, p. 42, lines 1-13; Exhibit No. 7, p. 3.

70. Lebrón and Ortíz walked further up by a two-level house, and then went into the yard where there is a residence for female mental patients; Lebrón went

to the right and Ortíz went to the left. They had no plan.  D. Exhibit No. 3, p. 44, line 25, and p. 45, lines 1-16.

71. After Lebrón split from Ortíz, he continued walking to the right and went down an abandoned path. He then reached the back of a business establishment known as "El Tequila", located on Road 175.  D. Exhibit No. 3, p. 45, lines 17-23.

72. After hearing shots, Lebrón ran up a hill.  While running, he did not have his firearm in his hands.  D. Exhibit No. 3, p. 47, L. 24-25, p. 49, lines 13-15.

73. Lebrón did not hear through the radio of any other reports of a person being wounded or hurt.  D. Exhibit No. 3, p. 50, lines 22-25.

74. Officer Ortíz informed Lebrón that he could hear someone in the brush asking for help; Ortíz told him he was going to go down and immediately started going down the ravine where the person was.  D. Exhibit No. 3, p. 51, lines 11-21.

75. Lebrón saw someone near the area where the injured person was, who he described as a young man, slight built, white-skinned and wearing long jeans.  D. Exhibit No. 3, p. 53, lines 7-10.

76. Once Lebrón notified through the radio that there was someone running towards the brush, he saw several, about eight or nine fellow officers running towards the area where Ortíz was running.   D. Exhibit No. 3, p. 53, lines 18-25 and p. 54, lines 1-3.

77.    Lebrón could hear a person screaming from where he was posted.  He did not hear Ortíz shout or tell him anything when he was near the Plaintiff.  D. Exhibit No. 3, p. 60, lines 15-24.

78.    Lebrón then saw from where he was that Plaintiff was carried to "El Tequila" by Ortíz and other officers.  D. Exhibit No. 3, p. 61, lines 6-25 and p. 62, lines 1-5.

79.    Lebrón observed two or three officers on one side and two or three officers on the other side, holding Plaintiff's head, feet and torso, in a horizontal fashion. Plaintiff was facing up.  D. Exhibit No. 3, p. 62, lines 1-12.

80.    Lebrón saw Ortíz again when the personnel from the NIE arrived at the scene and asked for their firearms to check which weapons had been fired.  D. Exhibit No. 3, p. 66, lines 8-16.

81.    Lebrón was not summoned by the NIE for any interview as part of the investigation. The CIC called him for a sworn statement and to get his weapon back on the following day.  He received a different weapon than the one he had.  D. Exhibit No. 3, p. 67, lines 1-17.

82.    Lebrón provided a statement at the Investigations Unit of Carolina.  D. Exhibit No. 3, p. 70, lines 12-15; D. Exhibit No. 7, pp. 3 and 4.

83.    Lebrón was not prosecuted for the incident.  D. Exhibit No. 3, p. 94, lines 18-25 and p. 95, lines 1-8.

## OFFICER JUAN CARLOS ORTIZ' ACCOUNT

84.   On December 31, 2010, Ortíz began his shift at 4:00 a.m. D. Exhibit No. 4, p. 37, lines 20-23.

85.   Ortíz's assignment was as a Patrol Officer, Investigator.  D. Exhibit No. 4, p. 38, lines 11-13.

86.   He first learned of the robbery that had taken place at the recycling center through the radio.  The radio stated that an armed robbery had taken place by several individuals, and that they had fled the scene in a four door, champagne colored Honda Accord.  D. Exhibit No. 4, p. 38, lines 14-25, and p. 39, lines 1-6; Exhibit No. 7, p. 5.

87.   Ortíz indicated to his patrolling partner, Lebrón, that they should serve as backup, and he informed via the radio that he was going to go to the scene as backup.  D. Exhibit No. 4, p. 40, lines 6-9; Exhibit No. 7, p. 5.

88.   Ortiz and Lebrón proceeded towards Road 845, where other officers were giving indications the chase was taking place. D. Exhibit No. 4, p. 43, lines 7-12; Exhibit No. 7, p.

89.   During the chase, officers informed that the car had stopped at Road 843.  They said the car had hit a fence and was  stuck in a gutter, with the right side doors open. D. Exhibit No. 4, p. 43, lines 13-21.

90.   When Ortíz (with Lebrón) arrived at the scene, the only Puerto Rico Police officer there was Sgt. Julio Galarza.  D. Exhibit No. 4, p. 52, lines 3-7.

91.    Then, Ortíz and Lebrón walked up the street and up into the woods. D. Exhibit No. 4, p. 52, lines 17-23; D. Exhibit No. 7, p. 5.

92.    Once Lebrón and Ortíz entered the woods, they split up, and they went in different directions.  Ortíz did not see any other officers in the area.  D. Exhibit No. 4, p. 53, lines 16-22.

93.    The area from where Ortíz was had a lot of grass, and was heavily wooded. D. Exhibit No. 4, p. 59, lines 10-23.

94.    Ortíz suddenly saw two individuals who were walking on the other side, and looking side-to-side, as if they were trying to figure out whether they were being chased.  D. Exhibit No. 4, p. 60, lines 10-15.

95.    Officer Ortiz saw the Plaintiff lie down. P Exhibit H, p. 88, lines 2-5.

96.    When Ortíz reached Plaintiff, he saw that he was injured.  Ortíz called for help, and realized that the ambulance was not going to come right away, so he and another officer picked Plaintiff  up, carried him and they put him in the pickup truck.  D. Exhibit No. 4, p. 97, lines 20-25, and p. 98, lines 1-2.

97.    Plaintiff was conscious throughout the entire time.  D. Exhibit No. 4, p. 98, lines 3-10.

98.    Once in the area where the suspects were, Ortíz did not receive instructions from his supervisor, Galarza, nor did he report to him on how to proceed in the operative. P. Exhibit H, p. 57, lines 14-20.

Carmen Lidia Jorge, et al. v. Police Department of the Commonwealth of Puerto Rico, et al.
Civil No. 11-2268 (JAG)
Report and Recommendation
Page 20

99.   Ortíz admits that there is an existing protocol outlining adequate levels of force that can be exerted by the Puerto Rico Police in different scenarios, however Ortíz does not review or examine it often. P. Exhibit H, p. 31, lines 24-25; p. 32, lines 1-7.

100.   Ortíz was unable to identify the levels of force that police officers may exert when performing an arrest four years after the incident. P. Exhibit H, l. 28, lines 10-25; p. 31, lines 5-7.

101.   Ortíz offered testimony at a plea hearing for the case brought by the Solicitor for Minors against Plaintiff EFJ. D. Exhibit No. 4, p. 113, lines 21-25, p. 114, lines 1-25, and 115, lines 1-20.

102.   Plaintiff pled guilty to some of the charges, which were related to the robbery. D. Exhibit No. 4, p. 115, lines 2-4, p. 116, line 20.

## LUIS MARTE AYALA'S ACCOUNT

103.   Luis A. Marte Ayala is an emergency management officer of the city of Trujillo Alto. He believes that the injured person should have been transported earlier. P. Exhibit G, p. 18, lines15-18.

104.   Over an hour elapsed since Marte learned that a person had been wounded and the time the wounded person was brought to the truck. P. Exhibit G, p. 17, lines 14-18.

105.   Marte believes that the person would have been better off transported in a patrol car than in the back of a truck and understands that the way the person

was transferred was not a safe and adequate way to transfer an injured person. P. Exhibit G, p. 18, lines 24-25; P.19, lines 1-3, 23-25 and p. 20, l. 1.

## SERGEANT JULIO GALARZA'S ACCOUNT

106.   The training on use of force and civil rights received by Sergeant Galarza was at the monthly staff meetings, called the "local Academy", where staff and officers under the command discuss several matters in an informal way P. Exhibit I, p. 14, lines 11-23.

107.   Besides the monthly staff meetings, while he was stationed in Trujillo Alto, Galarza received no other training on civil rights or use of force. P. Exhibit I, p. 15, lines 11-15.

108.   Galarza admits that there was a difference between 2010 and the current training requirements. This is because the Police Department is now under and obligation to provide a better disciplinary process to officers as a result of a stipulation between the local Department of Justice, the Federal Department of Justice and the Puerto Rico Police Department. P. Exhibit I, p. 39, lines 4-15.

109.   In 2010, the Police Department was not required to provide regular training on use of force and civil rights.  P. Exhibit I, p. 39, lines 23-25; p. 40, lines 1-2. These trainings are important to prevent violation of civil rights. P. 40, lines 3-7.

## JOSE FIGUEROA SANCHA

110.    Co-Defendant José Figueroa Sancha does not recall the incident that is the subject of the instant complaint.  D. Exhibit No. 5, p. 13, lines 3-25, and p. 14, lines 1-6.

111.    By the time Figueroa Sancha became Superintendent, the Court takes judicial notice that the United States Department of Justice ("USDOJ") had initiated an investigation on the Puerto Rico Police Department.  P. Exhibit N.

112.    During the course of the investigation and Figueroa Sancha's tenure as Superintendent,  the Court takes judicial notice that the USDOJ issued a report on its investigation performed on the allegations of use of force and violations of civil rights by Puerto Rico police officers. P. Exhibit N.

113.    The incident that gave rise to this complaint occurred during Figueroa Sancha's tenure as Superintendent of the Puerto Rico Police Department.  P. Exhibit K-1, P. 12, lines 10-14.

114.    The incident was referred for administrative investigation the same date it occurred, December 31, 2010. P. Exhibit K-1, P. 21, lines 1-6.

115.    The Police Department's administrative investigation regarding the incident that occurred on December 31, 2010 concluded on May 12, 2012, two years later. P. Exhibit K-1, P. 12, lines 10-25.

116.   The office responsible for conducting the administrative investigation of these types of incidents falls under Figueroa Sancha's supervision. P. Exhibit K-1, P. 14, lines 10-15.

117.   When confronted with the administrative investigation report of the incident produced by the Police Department, Figueroa Sancha admits that the other three officers who were at the scene and whose weapons were retrieved to be examined and evaluated to assess whether they had shot at Plaintiff should have been interviewed as part of the investigation, but were not. P. Exhibit K-1, P. 33, lines 11-22.

118.   Figueroa Sancha recognizes that the decision to use lethal force, as in this case, is based on training. P. Exhibit K-1, P. 43, lines 14-17.

119.   Figueroa Sancha does not know who Agent Juan Carlos Ortíz is, or his disciplinary history.  D. Exhibit No. 5, p. 46, lines 15-21.

120.   Figueroa Sancha does not know who Agent Iván Lebrón is, or his police disciplinary history.  D. Exhibit No. 5, p. 46, lines 22-25, p. 47, lines 1-3.

121.   Figueroa Sancha does not know who Agent Mayra Figueroa  is, or her police disciplinary history. D. Exhibit No. 5, p. 47, lines 4-11.

122.   Figueroa Sancha does not know who Agent Luis Rivera is, or his police disciplinary history.  D. Exhibit No. 5, p. 47, lines 12-17.

123.   Figueroa Sancha does not know who Agent Miguel Marrero Moya is, or his police disciplinary history.  D. Exhibit No. 5, p. 47, lines 18-21, p. 48, lines 6-9.

## LEOVIGILDO VAZQUEZ

124.   At the time the alleged facts of this case occurred, December 31, 2010, Leovigildo Vázquez' position at the Puerto Rico Police was Auxiliary Superintendent of Field Operations.  D. Exhibit No. 6, p. 1.

125.   The Auxiliary Superintendent position was specifically assigned the oversight of protecting rights by the Superintendent via the Puerto Rico Police Department General Order 2004-1.  P. Exhibit L-1; P. 4.

126.   That same order specifically appointed the Auxiliary Superintendent of Field Operations to be in charge of "imparting instructions for the use of firearms by the police" in 2004. P. Exhibit L-1; P.16.

127.   As Auxiliary Superintendent of Field Operations, Vázquez was at the relevant time empowered with numerous of the above responsibilities, including: implementing  plans and proposals (P. Exhibit L-1; P. 4); command over regional commanders (P. Exhibit L-1; P. 32); and controlling all Police Department activities relative to protection of civil rights and the prevention of crimes. (P. Exhibit L-1; P. 4).

128.   Co-Defendant Vázquez has no personal knowledge of what transpired on December 31, 2010 with regards to the complaint because he was not present when the events took place.  D. Exhibit No. 6, p. 1.

129.    Co-Defendant Vázquez does not personally know Mayra Figueroa, Iván Lebrón, Juan Carlos Ortíz, Sergeant Galarza, Luis R. Rivera or Miguel E. Marrero Moya. D. Exhibit No. 6, p. 1.

<u>THE AFTERMATH</u>

130.   As a consequence of the events, two criminal proceedings ensued: one against an adult, and another against a minor.  D. Exhibit No. 2, p. 40, lines 17-23.

131.   The adult accused in the criminal proceeding was Amaury Méndez-Rosado. D. Exhibit No. 2, p. 40, lines 24-25, and p. 41, lines 1-13.

132.   The Court takes judicial notice that in October, 2010, then Governor Luis Fortuño issued Executive Order 2010-53, creating the Office of the Independent Monitor of the Puerto Rico Police Department, who had the following duties, among others: monitor, investigate and evaluate all the operation of the Puerto Rico Police that could have an effect on its ability to protect constitutional and legal rights and prevent, detect and punish illegal conduct by its members; evaluate all policies, protocols, regulations and general orders in areas as recruitment, training, re-training, continuing education, supervision and disciplinary process, investigations of administrative complaints, use of force.  Among others, the Monitor was also

instructed to produce findings and recommendations geared to achieving practices that warrant the protection of civil rights of citizens. P. Exhibit M, p. 1, first paragraph. It issued a number of recommendations. Id.

133. The Court takes judicial notice that in September, 2011, the United States Department of Justice issued a report that found numerous deficiencies in the Puerto Rico Police's handling of many issues, including the use of excessive force. See Uncontested Fact No. 112.

## LEGAL ANALYSIS

Plaintiffs have challenged Defendants' arguments under two theories, to wit: (1) that the officers used excessive force against Plaintiff EFJ, and (2) that Vázquez and Figueroa Sancha, as supervisors, knew about the atmosphere of excessive force that permeated the Police Department and their inaction encouraged and condoned such behavior by the officers, so as to amount to deliberate indifference. This deliberate indifference, coupled with lack of training, ultimately caused harm to Plaintiff EFJ, rendering him a paraplegic.

### A.    Excessive Force.

The United States Supreme Court has held that claims of excessive force should be analyzed under the Fourth Amendment's "objective reasonableness standard." Graham v. Connor, 490 U.S. 386, 388, 394, 109 S.Ct. 1865, 1868, 1870-71 (1989). According to the Supreme Court, "police officers are often forced to make split-second judgments -in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation." Id. at 397, 109 S.Ct. at 1872. Therefore, the

reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. Id. at 396, 109 S.Ct. 1865 at 1872. The Graham Court enumerated a list of factors which must be examined in evaluating the merits of an excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S.Ct. 1865 at 1872. If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. Id.

Upon examining the arguments and facts set forth in both motions, the Court finds there are issues of material fact in dispute that prevent the Court from resolving whether the police officers in the present case used excessive force and, thus, violated Plaintiff's constitutional rights. Plaintiff EFJ has averred he ran from the car after it crashed because he was scared that the Police were going to do something to him and because the officers were firing at the car. He also stated the officers fired at him after he exited the car. At some point, Plaintiff EFJ gave up the chase and laid down on the grass (effectively surrendering) and was shot while he was laying face down and subdued in a grassy area. His friend Rafo was also laying down, with his feet near the top of Plaintiff's head. Plaintiff EFJ never saw Rafo use a firearm or heard him fire (even though he did see Rafo with a firearm earlier at the recycling station). Thus, Plaintiffs essentially argue that Defendants

shot Plaintiff EFJ even though he was unarmed and did not present any threat of danger, as he had already surrendered.

Officer Ortíz testified he saw Rafo raise a gun at him and open fire, firing several shots at him. Ortíz shot back in self-defense and a short shootout ensued. Officer Lebrón stated he saw Rafo bend down and pick something up from the ground, implying it might be a gun. The testimony of these two officers obviously clashes with Plaintiff EFJ's version of facts that Rafo was laying on the ground and did not shoot at the officers, and is the classic "he said-she said" scenario that precludes the entry of summary judgment.

There is also conflicting evidence regarding which officer shot and how many times shots were fired, thus precluding the entry of summary judgment on the excessive force claim, because naturally, whether or not the officers used excessive force will depend on the level of threat they faced. An individual opening continuous fire directly at the officers, if believed, could support that use of force; two individuals laying on the ground surrendering, would not.

Plaintiffs have also raised issues of fact regarding whether the use of deadly force was necessary or reasonable in light of the particular facts of this case that led to the ultimate incident where Plaintiff was shot in which the amount of money stolen was $112.00, and where the people held up were not seriously harmed.[4] Plaintiffs posit these circumstances work against Defendants, in that they had practically a posse looking for two youths who

---

[4] Plaintiffs' Exhibit B is a statement from one of these men, Rolando Santana Ross, which indicates that when one of the two assailants held him up, he was hit on the head with the butt of the gun; the assailant did not otherwise hurt him. See Docket No. 209, Exh B, and Docket No. 220-1.

stole a little over $100 dollars and did not severely harm anyone, and that deadly force should not have ensued under those circumstances.

A genuine issue of material fact exists if a reasonable jury could find for either party on the contested matter.  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). Here, there are two differing versions of the same facts, and the reasonableness of Defendants' actions will depend on the credibility of all parties  regarding the facts at issue. Thus, it is the jury that has to assess credibility, and in turn, determine whether those actions  were reasonably in light of the evidence that will be presented to them.

In addition, regarding officer Lebrón, Plaintiffs posit dismissal is unwarranted, insofar as there are issues of fact surrounding his involvement in the shootout.  Although he has denied shooting his weapon, Plaintiff and officers Maysonet Rivera and Lebrón himself testified that there were shots fired, and there is conflicting evidence as to exactly how many.   The fact that no bullet casings were recovered when at least two shots were fired against Plaintiff EFJ (and when one hit him) also weighs against Defendants' denials. Further undermining the defense is the fact that the forensic report on the officers' guns was never performed and most of the officers involved in this case were never questioned by the NIE as part of that administrative body's investigation.  Yet, these are clearly factual matters of credibility which are only proper for a jury, and not the Court, to resolve.

Finally, it has been held that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance.  Torres Rivera v. O'Neill Cancel, 406

F.3d 43 (D.P.R. 2005)(*quoting* Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, (1st Cir. 1990); Byrd v. Brishke, 466 F.2d 6, 10-11 (7th Cir.1972) and Hathaway v. Stone, 687 F.Supp. 708, 711-12 (D. Mass. 1988)).  Under these circumstances, where Lebrón's actions are unclear, dismissal is not appropriate.  It should be the jury who resolves these factual inconsistencies and determines what responsibility, if any, this Defendant has.

In view of the foregoing, it is recommended that the Motion for Summary Judgment on the excessive force claim be DENIED.

## B.    Supervisory Liability.

To sustain a cause of action based on a theory of supervisory liability, a plaintiff must establish that "(1) the behavior of [the supervisor's] subordinates results in a constitutional violation and (2) the supervisor's action or inaction was 'affirmatively linked' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence of the supervisor amounting to deliberate indifference.' " Hegarty v. Somerset Cty., 53 F.3d 1367, 1379-80 (1st Cir. 1995) (*quoting* Lipsett v. University of Puerto Rico, 864 F.2d 881, 902-03 (1st Cir. 1988)); see also Gutiérrez-Rodríguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).  Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization. Id. (*citing* Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999).  This necessarily means that a supervisor must have "some kind of notice of the alleged violations." Lipsett, 864 F.2d at 902 (*citing* Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292 (1986)).

In essence, co-defendants Figueroa Sancha and Vázquez assert there is no evidence they personally engaged in or condoned any of the allegedly excessive use of force, and, going even further, they posit that no liability can attach as they do not personally know Plaintiff EFJ or the officers involved, and because they were not at the scene of the incident.

However, Plaintiffs have presented evidence that points to the existence of an atmosphere of possible supervisory encouragement, condonation or acquiescence amounting to deliberate indifference and lack of supervision at the Puerto Rico Police Department.  For starters, there was no hands-on training in the use (or prevention) of excessive force and of civil rights by the Police Department after the officers graduated from the Police Academy.  All the officers had was the "local Academy" which consisted of an informal meeting roughly every month where communications from Police Headquarters were discussed and discussions about the use of force and civil rights were held.  The fact that officers Figueroa and Lebrón admitted they had not received any further training in civil rights and excessive force violations since they studied at the Police Academy does little to help Defendants' case.  Officer Ortíz, who admitted to shooting when allegedly threatened by Rafo, could not summarize or explain the parameters for handling guns and the use of force when performing an arrest when he was deposed four years after the incident, and after a training program had allegedly been implemented in the Puerto Rico Police force.

Sergeant Julio Galarza, the highest ranking officer at the scene of the incident, likewise admitted that, at the time the events that gave rise to this complaint took place in

2010, the Police Department was not required to provide regular training on use of force and civil rights to its officers.  That is directly in contrast to today, where the Police Department is under an obligation to provide a better disciplinary process to officers as a result of a stipulation between the local Department of Justice, the Federal Department of Justice and the Puerto Rico Police Department.  Galarza further admitted that trainings are important to prevent violation of civil rights.

Buttressing these admissions by Galarza are the findings of the reports by the United States Department of Justice and the Police Department Monitor Efraín Rivera Pérez.  Thus, the fact that co-defendants Vázquez and Figueroa Sancha were not at the scene of the incident is of little use to them if Plaintiffs can establish that they, as high ranking officers of the Police Department, had knowledge about the constitutional violation atmosphere that permeated the Police Department and did nothing about it.

It is well established that a plaintiff may prove causation of a constitutional violation by "showing a pattern of police violence so striking as to allow an inference of supervisory encouragement, condonation, or even acquiescence, or by showing gross negligence [of the defendant] amounting to deliberate indifference."  Guadalupe-Baez v. Police Officers A-Z, Civil No. 13-1529, 2014 WL 4656663 at *5 (D.P.R. September 17, 2014).

At this stage, Plaintiffs have created a genuine issue of fact that precludes summary disposition of these claims.  Vázquez, as the person in charge of controlling all Police Department activities related to the protection of civil rights and crime prevention, and who was in charge of protecting rights and imparting instructions on the use of firearms,

certainly was in a position to know about the possible use of excessive force in the Department.  As part of his duties, he would have certainly also known that most officers did not receive any further hands-on training or refresher courses after graduating from the Police Academy, except some informal monthly meetings.

Furthermore, the fact the Department of Justice, as well as the Puerto Rico Police Monitor's investigations into precisely these types of actions were happening at the same time Vázquez was in office weighs heavily against Defendants.  And of course, these same arguments apply to Figueroa Sancha, who, as head of the Police Department, appointed Vázquez to that position, and to whom Vázquez directly reported to.  These inferences, which the Court must make in favor of Plaintiffs as the non-moving party, preclude summary disposition of these claims.  Therefore, it is recommended to the Court that Defendants' Motion for Summary Judgment on these claims be DENIED.

Defendants have also argued for summary dismissal of the claims against co-defendants Mayra Figueroa and Emilio Díaz, yet the Court dismissed their claims in June 2014 (Docket No. 202).  Therefore, it is recommended that these claims be dismissed as moot.

### C.    Qualified Immunity.

Defendants have also raised the qualified immunity defense, alleging that given the nature of Defendants' administrative records, "it cannot be said that they departed from objective legal reasonableness or otherwise incurred in a violation of clearly established law,

particularly given the fact that there was no precedent where liability had attached in an analogous scenario".  (Docket No. 162, p. 15.)

As is well known, a two-part test shapes the qualified immunity inquiry.  The Court should deny a defendant qualified immunity if: (1) the facts a plaintiff has either alleged or shown establish a violation of a constitutional right; and (2) the constitutional right at issue was clearly established at the time of the defendant's alleged violation.  Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 51 (1st Cir. 2010).

Clearly established, in turn, means that the contours of the right are sufficiently clear such that "a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).  That is, "a right is clearly established if, at the time the defendant acted, he was on clear notice that what he was doing was unconstitutional."  Costa-Ureña v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009). Only if it is determined that the law was clearly established should the court address "the particular conduct in question," Abreu-Guzmán v. Ford, 241 F.3d, 69, 73 (1st Cir. 2001), to decide whether an objectively reasonable official would have believed that his conduct was lawful "in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct. McBride v. Taylor, 924 F.2d 386, 389 (1st Cir.1991); see also, Swain v. Spinney, 117 F.3d 1, 9–10 (1st Cir. 1997) (noting that the objective reasonableness inquiry is "highly fact specific").

Unsurprisingly, it is clearly established that it is unreasonable to use deadly force on an unarmed, non-dangerous suspect.  Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694

(1984).  Determining reasonableness, however, is more problematic, because while the first part of the inquiry deals with abstract legal rules, the final step depends on the facts of a given case.  See Hatch v. Dep't for Children, Youth & their Families, 274 F.3d 12, 24 (1st Cir. 2001).  The standard is an objective one, that is, was it clear, to an objectively reasonable official situated similarly to Defendants, that the actions taken (or omitted) contravened the clearly established right?  See Anderson, 483 U.S. at 639, 107 S.Ct. 3034 (emphasizing that the standard is an objective one).

Pretrial resolution of qualified immunity claims will sometimes be impossible because of a dispute as to material facts.  Indeed, the Court of Appeals for the First Circuit has expressed that the "objective reasonableness of the offense," although also a question of law, is a matter that must be determined by the jury when there are factual disputes as to material issues of fact.  Kelley v. LaForce, 288 F.3d 1, 6-7 (1st Cir. 2002). Thus, "while preliminary factual questions regarding qualified immunity are sent to the jury, the legal question of the availability of qualified immunity is 'ultimately committed to the court's judgment.' " Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 83-84 (1st Cir. 2006).  In such a case, the factual issues must be decided by the trier of fact, thereby precluding summary judgment.

Based on the analysis above, whether the officers were reasonable in their use of force will depend on whether on not they were faced with a potentially dangerous and deadly situation, where a shooter aimed directly at officer Ortíz.  Plaintiff ELJ posits this was not the case, as Rafo was on the ground, next to him, unarmed.  The number of shots

actually fired would also weigh into this analysis, as more shots might possibly indicate crossfire and help prove Defendants' theory.  Either way, Plaintiffs have raised the specter of a potentially unreasonable police action which cannot be resolved by the Court without the jury.

Regarding Figueroa Sancha and Vázquez, the question would be whether they have reasonably understood that failure to train the officers in the Police Department could lead to a violation of Plaintiffs' constitutional rights.  Possibly, but again, reasonableness is a question of fact for the jury to analyze.  Qualified immunity should therefore be denied without prejudice, so Defendants may raise the defense again at the trial, where the Court will resolve the issue of qualified immunity after the return of a verdict.  See Kelley, 288 F.3d at 7 ("Only after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella").

As such, it is recommended that the Motion for Summary Judgment on qualified immunity grounds be DENIED WITHOUT PREJUDICE.


**D.      State Law Claims.**

Defendants request dismissal of Plaintiffs' state-law claims on the assumption the Court would dismiss the federal claims. See López Mulero v. Vélez Colón, 490 F.Supp.2d 214, 227 (D.P.R. 2007) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims.").

Carmen Lidia Jorge, et al. v. Police Department of the Commonwealth of Puerto Rico, et al.
Civil No. 11-2268 (JAG)
Report and Recommendation
Page 37

Considering the above discussion, however, since dismissal of the federal claims is not recommended, dismissal of the state claims would be unreasonable.

## CONCLUSION

For the aforementioned reasons, it is recommended that Defendants' Motion for Summary Judgment (Docket No. 162) be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation. See Amended Local Rules. Failure to file same within the specified time waives the right to appeal this order. See Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986) and Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988).

In San Juan, Puerto Rico, on this 1st day of October, 2015.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE